**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SAMUEL, SON & CO. (USA) INC.
*Plaintiff*,

v.

Civil Action No. ELH-24-2861

SC PROPERTY, LLC.*,*
*Defendant.*

**MEMORANDUM OPINION**

Plaintiff Samuel, Son & Co. (USA) Inc. ("Samuel"), tenant, filed suit against its current

landlord, Clean Harbors Environmental Services, Inc. ("Clean Harbors"), and its former landlord,

SC Property, LLC ("SC"), seeking compensatory damages under a lease as well as declaratory and

injunctive relief.  ECF 16 (Amended Complaint). *Id.*  The case arises from a dispute regarding an

option to renew a lease.[1]  The tenant contends that it is entitled to exercise the option, but the

landlords disagree.

Pursuant to a lease agreement (ECF 16-1, the "Lease"), Samuel rented a warehouse and 40

parking spaces ("Leased Premises") from SC, located at 1700 Ridgely Street in Baltimore (the

"Property"), for a five-year term, beginning October 1, 2017 and ending on September 30, 2022.

ECF 16, ¶¶ 10, 19; *see* ECF 16-1.[2]  The Property consists of four units.  ECF 61-1 (Mark Foster

Declaration), ¶ 8.  Samuel leased Unit 2, containing almost 65,000 square feet, as well as 40

parking spaces in Unit 4.

---

[1] Samuel filed suit on August 28, 2024, in the Circuit Court for Baltimore City.  ECF 3.
Clean Harbors removed the case to federal court on October 2, 2024, on the basis of diversity
jurisdiction.  ECF 1.

[2] Samuel is the successor in interest to "Samuel, Son & Co. Inc., a New Jersey
Corporation," which was the lessee.  ECF 16, ¶ 9; *see* ECF 50-1, ¶ 5; ECF 59-1, ¶ 5.

Section 3.2 of the Lease is titled "Renewal Option".  ECF 16-1 at 19 (the "Option" or the "Renewal Option"). It provides, in part: "Tenant shall be entitled to renew this Lease for one (1) additional term of two (2) Lease Years, commencing immediately following the expiration of the *original* Term[.]"  *Id.* (emphasis added).

Effective September 30, 2022, Samuel and SC amended the Lease.  Samuel alleges that the amendment extended the original term of the Lease through September 30, 2024, but did not constitute the exercise of the renewal option.  *See* ECF 16-2.  SC and Clean Harbors maintain that the amendment constituted an exercise of Samuel's one option to renew.

In January 2024, SC sold Unit 2 and Unit 3 of the Property to Clean Harbors, but retained ownership of Unit 4, where the forty parking spaces are located.  *See* ECF 49-9; ECF 49-2 at 6–7.  As part of the sale, SC assigned all of its rights and obligations as Samuel's landlord to Clean Harbors.  ECF 49-12.

In March 2024, after the assignment of SC's obligations under the Lease to Clean Harbors, Samuel sought to extend its Lease for two years.  ECF 50-4.  Clean Harbors rejected the request, claiming that Samuel had previously exercised its Renewal Option.  ECF 50-5 at 1.  Samuel disagreed.

SC and Clean Harbors contend that the Lease expired on September 30, 2024.  Until that date, SC set aside fifty parking spaces for Samuel's use during home games for the Baltimore Ravens.  ECF 49-13 (Mark Foster Affidavit), ¶ 15; *see* ECF 49-2 at 7.  Beginning in October 2024, however, SC set aside only five spaces.  ECF 49-13, ¶ 16.  Moreover, beginning in October 2024, SC charged Samuel for its use of all but five parking spaces during Ravens home games.  *Id.*

In the Amended Complaint, Samuel sued Clean Harbors for breach of lease (Count One).  ECF 16, ¶¶ 50–55.  Samuel also lodges a breach of lease claim against SC (Count Two).  *Id.* ¶¶

2

56–62.  In addition, Samuel asserts a claim against SC for tortious interference with contractual relations (Count Three), alleging that SC wrongfully blocked Samuel's access to the 40 parking spaces in Unit 4.  *Id.* ¶¶ 63–74.  And, Samuel seeks declaratory relief (Count Four), to the effect that Samuel properly exercised its two-year option (*id.* ¶¶ 75–81), as well as injunctive relief (Count Five, *id.* ¶¶ 82–86).

Both SC and Clean Harbors answered the suit.  ECF 21 (Clean Harbors); ECF 24 (SC).  In addition, Clean Harbors filed a counterclaim, alleging that Samuel breached the Lease.  ECF 5, ¶¶ 32-36.

SC filed a post-discovery motion for summary judgment.  ECF 49.  Samuel moved for partial summary judgment.  ECF 50.  After full briefing of the motions, Samuel and Clean Harbors "settled the claims they filed against one another", and asked the Court to dismiss with prejudice "Count One of the Amended Complaint" and "those parts of Counts Four and Five that purport to state a claim against" Clean Harbors.  ECF 68 at 2–3.  Additionally, Clean Harbors sought dismissal with prejudice of its counterclaim  against Samuel.  ECF 67.[3]  On September 16, 2025, the Court dismissed with prejudice Samuel's claims against Clean Harbors and Clean Harbors' counterclaim against Samuel.  ECF 69; ECF 70.

The summary judgment motions of SC and Samuel remain. SC seeks summary judgment on all counts and also claims that it is entitled to attorneys' fees and costs under the Lease.  SC's motion is supported by a memorandum (ECF 49-2) (collectively, "Motion") and twelve exhibits.  ECF 49-3 to ECF 49-14.  Samuel opposes the Motion.  ECF 59.  SC replied.  ECF 66.

---

[3] In ECF 67, Samuel and Clean Harbors erroneously identified ECF 15 as the counterclaim. *See* ECF 67, ¶ 4.  However, ECF 15 was filed by Samuel in response to Clean Harbors' Answer, Affirmative Defenses, and Counterclaim.  The counterclaim is docketed at ECF 5, not ECF 15.

Samuel's motion (ECF 50, "Cross Motion") is supported by five exhibits.  ECF 50-1 to ECF 50-5.  Samuel seeks summary judgment as to Count Four, and asks the Court to "declare that the subject lease allowed for Samuel to exercise its right to a two-year option to extend the lease term to September 30, 2026, and that Samuel timely exercised its option."  ECF 50 at 2.  SC opposes the Cross Motion.  ECF 60.[4] Samuel replied.  ECF 63 ("Cross Reply").

No hearing is necessary to resolve the motions. *See* Local Rule 105.6.  For the reasons that follow, I shall grant SC's Motion as to Counts Two, Three, Four, and Five but deny the Motion with respect to SC's request for attorneys' fees.[5]  I shall also deny Samuel's Cross Motion.

## I.       Factual Background

### A.  The Parties

Samuel is a Delaware corporation with its "head office" in Illinois.  ECF 16, ¶ 1.  It is the successor in interest to the original lessee, Samuel, Son, & Co. Inc., a New Jersey Corporation. *Id.* ¶ 9; ECF 50-1, ¶ 5; ECF 59-1 ¶ 5.  Samuel used the Leased Premises for "a steel service and distribution center with light processing and manufacturing of metals and on-site parking for their [sic] employees."  ECF 16, ¶ 14.  It is also a "supplier to the defense industry. . . ." *Id.*  Therefore, it is subject to various federal laws. *Id.* ¶¶ 14, 15.

Second Chance, Inc. ("Second Chance") is the sole member of SC.  ECF 61-1, ¶ 6. Second Chance is a Maryland nonprofit corporation, headquartered in Baltimore.  ECF 10.  Mark Foster is the President and CEO of both Second Chance and SC.  ECF 49-6 at 3; *see* ECF 49-13, ¶ 2; ECF 61-1, ¶ 6.

---

[4] Prior to settlement, Clean Harbors had opposed the Cross Motion.  ECF 61; ECF 62-1.

[5] Count One is not in issue; that claim has been resolved.

Clean Harbors provides environmental and industrial services, including "end-to-end hazardous waste management, emergency spill response, industrial cleaning and maintenance, and recycling services." ECF 61-22, ¶ 8.  It uses its Maryland facility "as a treatment facility for a variety of industrial wastewater and as a transfer station for other industrial waste[.]" *Id.* ¶ 13.

### B.  The Lease

On August 24, 2017, SC and Samuel entered into the Lease, titled Ridgley Bush Condominium Standard Form Net Lease Agreement.  ECF 16-1; *see* ECF 49-13, ¶ 6; ECF 59-1 (George Dowell Affidavit), ¶ 4; ECF 61-1, ¶ 9.  As noted, SC's Property consists of four units. ECF 61-1, ¶¶ 7, 8.

Pursuant to Section 1.12 of the Lease, Samuel rented Unit 2 of the Property, containing 64,868 square feet, and forty parking spaces located in Unit 4 of the Property.  ECF 16-1 at 2, 5–6.  Section 1.11 of the Lease is titled "Permitted Use."  It states, *id.* at 2:  "The use of the Premises as a steel service and distribution center with light processing and manufacturing of metals, and related offices, or any other use as approved by the Landlord in its sole discretion, all in accordance with applicable laws and regulations and for no other purpose."  *See* ECF 59-1, ¶ 6 (stating that Samuel used the Leased Premises as "a steel service and distribution center with light processing and manufacturing of metals" and for "on-site parking for their employees").

The Lease had a "Term" of five years.  It commenced on October 1, 2017, and terminated on September 30, 2022.  *See*  ECF 16-1 at 13; ECF 61-1, ¶ 11.

Section 3.2 of the Lease, titled "Renewal Option," is pertinent.  *See* ECF 16-1 at 19.  It provides, *id.* (emphasis added):

> Provided Tenant is not in default of any of its obligations under the Lease and is in possession of the Premises, *Tenant shall be entitled to renew this Lease for one (1)*

*additional term of two (2) Lease Years,* commencing immediately following the expiration of *the original Term* on the same terms and conditions of this Lease, with the following conditions:

(a) With respect to the renewal term, Tenant will give written notification to Landlord not later than six (6) full calendar months prior to the scheduled termination date of the Term of its intention to elect to renew the Lease.

(b) Promptly following receipt of Tenant's notification of intent, Landlord shall send Tenant a notice specifying Landlord's then-current Basic Rent rate for the Premises (the "Offer Rate"), which shall as [sic] determined by the Landlord in the sole and unfettered exercise of its discretion.

(c) Tenant shall have ten (10) business days following receipt of Landlord's notice to inform Landlord whether it will accept a renewal of the Lease at a Basic Rent equal to the Offer Rate.

(d) If Tenant accepts the Offer Rate and elects to lease the Premises for the renewal term above set forth pursuant to the renewal right granted in this Section then Tenant shall execute a Lease Amendment extending the Term and confirming the new Basic Rent within ten (10) business days of receipt of an instrument of amendment from Landlord. If Tenant rejects or challenges Landlord's determination of the Offer Rate then Landlord and Tenant shall cooperate in determining a mutually acceptable formulation of the Offer Rate; provided, however, that if, notwithstanding the cooperative efforts of such parties, Landlord and Tenant are unable to agree upon the Offer Rate within twenty (20) business days following the date of Landlord's original notice to Tenant stating the Offer Rate, then the rights and options granted to Tenant pursuant to this Section shall thereupon be deemed to have lapsed and terminated. The parties specifically understand, acknowledge and agree that, in such case, neither party shall have any liability to the other, under any legal or equitable theory whatsoever, for the parties' failure to determine a mutually acceptable Offer Rate, it being understood that, in the absence of such agreement, the Landlord's determination of the Offer Rate shall ultimately control.

(e) Any improvements to the Premises to be completed in connection with any such renewal shall be as negotiated by Landlord and Tenant at such time.

(f) Time shall be of the essence with respect to each of the provisions of this Section; if Tenant fails or refuses to provide notices or to take action as provided in this Section within the times herein set forth then the renewal right and option herein granted shall lapse and terminate.

(g) *No additional rights or options to renew shall be deemed to be granted*.

### C.  Lease Renewal Terms Sheet and Lease Amendment

As indicated, the Lease terminated on September 30, 2022.  ECF 16-1 at 13.   Prior to that date, SC and Samuel corresponded regarding an extension of the Lease.  *See* ECF 49-5 at 25–54; ECF 61-1, ¶ 13.  On November 1, 2021, George Dowell, the General Manager at Samuel, wrote to Foster, noting that the Lease would be "up for renewal next year" and asking to "meet in the next few weeks to talk about another 5 year re-up?"  ECF 49-5 at 54; *see* ECF 59-1, ¶ 2; ECF 61-1, ¶ 19.

Over the next few months, Foster and Dowell continued to discuss the Option.  *See* ECF 49-5 at 53–48; ECF 61-1, ¶ 20.  The correspondence reflects that Samuel sought to exercise the Renewal Option while also pursuing a longer extension.  For example, in an email from Dowell to Foster dated January 17, 2022 (ECF 49-5 at 52), Dowell stated: "After talking to our lease corporate guy we have until 3/31 to take the 2 year option, however we would like to do another 5 year [sic] with an option or extend the current option if possible."  *See also* ECF 61-1, ¶¶ 22, 23.

In early January 2022, Foster wrote to Dowell, stating that he was "trying to get the current state of the marketplace as to rates" to prepare an option proposal for Dowell.  ECF 49-8 at 23.  Foster and Dowell arranged to meet on January 20, 2022.  *Id.* at 22.  After the meeting, Dowell sent an email to Foster asking if he needed "anything from Samuel to submit a proposal on a new lease?"  *Id.*  Dowell noted that he hoped "everything" could be "settled in the next few weeks to continue" the "partnership" between SC and Samuel.  *Id.*  Foster responded that SC had "asked a couple of professional real estate agency people . . . to provide an overview of recent lease transactions", because "things" had "shifted in the market for industrial leases[.]"  *Id.* at 21.

Shortly thereafter, John Lennartz, Vice President of Environment, Energy & Real Estate at Samuel, wrote to Foster.  *Id.* at 20.  Lennartz noted that the two had spoken the previous week and

7

asked if Foster was "OK to receive the letter about exercising our renewal option[.]" *Id.* Foster replied, stating that he would accept the letter via email. *Id.*; *see* ECF 61-1, ¶ 26. The following day, March 17, 2022, some six months before the Lease was scheduled to expire, Lennartz emailed the letter to Foster. ECF 49-4 at 2; ECF 49-8 at 19; ECF 49-13, ¶ 7. It is addressed to SC Property, to the attention of Foster. ECF 49-4 at 2.

Of import, the subject line of the letter states: "Notice of Intent to Exercise Option to Renew – 1700 Ridgely Street, Unit 2, Baltimore, MD" *Id.* Moreover, Lennartz expressly stated: "Please accept this letter as confirmation of Samuel, Son & Co. (USA) Inc.'s intent to exercise the option to renew pursuant to Section 3.2 of the Ridgley Bush Condominium Standard Form Net Lease General Terms and Conditions to Lease, dated August 24th, 2017." *Id.* Lennartz also wrote, *id.*: "While the existing renewal option is for two (2) years, per our conversation on March 9th, 2022, we are interested in a five (5) year term, if you are amenable to such a term." *Id.* The letter also requested SC's rate proposals for two and five year terms. *Id.*

In May 2022, representatives of SC and Samuel met to discuss the renewal of the Lease. *See* ECF 61-7 at 2. In email correspondence prior to the meeting, Clayton Shelhoss, the Chief Operating Officer of Second Chance, wrote to Lennartz and Dowell. *Id.* Shelhoss noted that SC had "been unable to locate" a "copy of the 2 year Lease extension" but stated that SC "intend[ed] to honor" Samuel's "ability to renew for 2 years[.]" *Id.* In addition, Shelhoss wrote that he planned to "discuss a longer term relationship" at the upcoming meeting. *Id.* Dowell responded, attaching the "full lease" and referencing "section 3.2," the renewal provision of the Lease. ECF 61-8 at 2.

The meeting took place on May 26, 2022. ECF 61-9 at 2; ECF 61-1, ¶¶ 34–35. Foster's meeting notes (ECF 61-9) are captioned "Samuel Lease Discussion–May 26, 2022." *Id.* at 2. The

notes reflect an offer rate for Samuel of "$7.95 NNN [triple net]" [6] for a "2 Year term[.]"  *Id.*

Foster also wrote: "Next Term offered will be after decision on sale– +/- 4 months[.]"  *Id.*  Notably,

paragraph 2 of the notes concerns "Renewal."  It states:  "2 year term."  *Id.*

By email of July 4, 2022, Foster sent Lennartz and Shelhoss "the parameters of the Lease

Renewal starting October 1, 2022 . . . ."  ECF 61-11 at 2.  He also attached to the email his notes

from the meeting in May.  *Id.*[7]  In addition, he stated in the email, *id.*:  "Our expectation is still to

sell all or part of the Property by the end of this year . . . ."

Foster "prepared a document entitled 'Lease Renewal Terms.'"  ECF 61-1, ¶ 42.  SC,

through Foster, presented the "Lease Renewal Terms" to Samuel in an undated document.  ECF

49-6 ("Lease Renewal Terms"; "Lease Renewal Terms Sheet"; or "Terms Sheet"); *see also* ECF

61-9 (same).  Among other things, the Terms Sheet reflects a "Renewal Starting Date" of October

1, 2022, and a "Renewal Commencement" of October 1, 2022.  ECF 49-6 at 2; ECF 61-9 at 3.

And, it expressly specifies a "Renewal Term" of "Twenty Four (24) months expiring September

30, 2024."  ECF 49-6 at 2.  Of significance, on July 15, 2022, Lennartz wrote "Accepted" on the

"Lease Renewal Terms."  ECF 49-6 at 3; *see* ECF 49-13, ¶ 9; ECF 61-1, ¶ 44.

Other provisions of the Lease Renewal Terms Sheet are also pertinent.  It identifies Samuel

as the Tenant and SC as the Landlord.  ECF 49-6 at 2.  A provision titled "Renewal Option" states,

in part: "Tenant is exercising one (1) two (2) year option to renew the Premises at 100% of the

---

[6] A triple net lease is often referred to as an NNN lease.  *What is a Triple Net Lease and How Does it Work?* LEGAL CLARITY (last accessed Jan. 18, 2026).  Under a triple net lease, "the tenant assumes a substantial portion of the property's operating expenses in addition to the base rent."  *Id.*

[7] The notes (ECF 61-9)  are an exhibit to Foster's Declaration (ECF 61-1).

current fair market rent and has provided six (6) months prior written notice to Landlord.  All other terms and conditions shall be substantially the same as in the lease." *Id.*

Further, the Terms Sheet describes "Building Use" as "General office, warehouse, storage and other lawful purposes." *Id.*  In a provision titled "Access", the Terms Sheet states that the tenant has access "24 hours a day, 7 days a week, 365 days per year." ECF 49-6 at 3.  As noted, the Terms Sheet also indicates that the renewal commences on October 1, 2022.  ECF 49-6 at 2.  And, it refers to the "Leased Premises" as "+/- 64,868 sf", which corresponds to the square footage of Unit 2 of the Property.  *Id.*; *see* ECF 16-1 at 2.  Moreover, it establishes a "Renewal Rate" of "$7.95" per square foot "NNN for entire 24 month Renewal Period[.]"  ECF 49-6 at 2.

In sum, the Terms Sheet plainly shows that Samuel was "exercising one (1) two (2) year option to renew" the Lease for an extension of 24 months.  ECF 49-6 at 2.  According to Foster, however, Samuel "insisted" on "a more formal document . . . embodying the parties' agreement contained in the Lease Renewal Terms Sheet."  ECF 61-1, ¶ 47.  Samuel drafted the document.  ECF 49-5 at 25–26.  Effective September 30, 2022, SC and Samuel entered into the "First Amendment to Lease."  ECF 49-7 ("Lease Amendment"); *see* ECF 49-13, ¶ 10; ECF 50-1, ¶ 7; ECF 59-1, ¶ 7.[8]

The Lease Amendment provides that "the current term of the Lease expires on September 30, 2022."  ECF 49-7 at 2.  The fourth "Whereas" clause in the Lease Amendment states, *id.*

---

[8] Foster signed the Lease Amendment on September 30, 2022.  ECF 50-3 at 4; ECF 61-12 at 5.  Both sides submitted the Lease Amendment as an exhibit.  ECF 49-7 (SC); ECF 50-3 (Samuel); ECF 61-12 (Clean Harbors).  Royston Goveas, the Director of Procurement at Samuel, is the signatory on the Lease Amendment for Samuel, and he signed on March 22, 2023.  ECF 49-7 at 5; ECF 50-3 at 5. The Lease Amendment submitted by Clean Harbors (ECF 61-12) specifies that Samuel signed the Lease Amendment on December 7, 2022, and that Suzanne Mitskovski, the Director of Finance at Samuel, was the signatory.  *Id.* at 6.  Neither side addresses this discrepancy.

(emphasis added): "*Landlord and Tenant desire to memorialize the extension of the Term of the Lease,* to provide for the determination of fair market rent for the option period, should Tenant elect to so exercise the option, and to further modify such other provisions of the Lease as set forth herein."

Section 2 of the Lease Amendment is titled "Extension of Term." *Id.* It states, in part, *id.* (emphasis added): "*The Lease is hereby amended such that the original term of the Lease is extended for a period of two (2) years,* commencing on October 1, 2022, and expiring at 11:59 p.m. on September 30, 2024 (such period, the 'Extension Term')." *Id.* Of relevance here, and central to Samuel's position, the provision also states, *id.*:

> From and after the Effective Date of this Lease Amendment, all references in the Lease to the original term of the Lease shall be deemed and construed to include the Extension Term, and all terms and provisions in the Lease shall apply fully during such Extension Term to the same extent as if the Extension Term has been included originally in the Lease as part of the original term of the Lease, except as may be expressly modified by this First Amendment.

The rent listed in the Lease Amendment matches the rent in the Lease Renewal Terms, *i.e.*, $7.95 per square foot. *Id.* The Lease Amendment "deleted in its entirety and replaced" Section 3.2(d) of the original Lease. *Id.* at 3, ¶ 4. It concerns the process if the Tenant "elects to lease the Premises for the renewal term above. . . ." *Id.* at 3.

Section 5 of the Lease Amendment is titled "Access." *Id.* It states: "Tenant and its employees, invitees, and guests, shall have access to the Premises twenty-four (24) hours per day, seven (7) days per week, and three hundred sixty-five (365) days a year during the First Renewal Term." *Id.*

Section 10, titled "Lease Binding/Ratification", states, *id.* at 4: "All terms of the Lease not expressly amended hereby shall remain in full force and effect and by this reference are incorporated herein as if fully rewritten herein, and the Lease, as amended hereby, is ratified and

affirmed by Landlord and Tenant."  Moreover, Section 11, titled "Entire Agreement," provides that the Lease, as amended, "constitutes the final, complete, and exclusive statement" of the parties' "agreement" and "supersedes any and all prior . . . agreements of the parties." *Id.*  Section 13 of the Lease Amendment, titled "Conflicts", provides: "In the event of a conflict between the Lease Amendment and the Lease, the terms and provisions of this Lease Amendment shall, in all instances and for all purposes, control." *Id.*

After the Lease Amendment went into effect, the parties had additional communications regarding a further extension of the Lease.  *See, e.g.,* ECF 49-5 at 11–12 (email from Foster to Lennartz on December 29, 2022, "offering to amend the [Lease] term from 2 (two) years to 5 (five) which I believe is what you may have initially wanted[.]"); ECF 49-8 at 13 (email from Dowell to Foster on July 27, 2023, inquiring if Foster had "some time next week to meet to talk about the offer to extend" Samuel's "lease past Sept 2024" and asking whether a "series of (2) 1 year options on an extension would be agreeable for Second Chance that would allow" Samuel "to stay into 2026"); *see also* ECF 61-22 (Bryan Girts Declaration), ¶ 19 (stating that Foster informed him that "Samuel on several occasions had raised with [Foster] the possibility of extending the Lease beyond September 30, 2024," but SC "had not done so because it wanted to market the property without such an extension").

By email of July 27, 2023, Dowell, the General Manager at Samuel, sought an update from Foster regarding "Clean Harbors buying condo's 2 & 3[.]"  ECF 49-8 at 13.  Foster responded, stating that it was "likely" that Clean Harbors would "purchase Condo 2 and 3[.]"  *Id.* at 12.  Moreover, Foster stated that he could not "do anything related to Lease extensions unless" the sale to Clean Harbors "falls apart[.]"  *Id.*

### D.  Sale of Units 2 and 3 to Clean Harbors

As of May 2022, SC was marketing the Property for sale, either as four separate parcels or in its entirety.  ECF 61-1, ¶ 37.[9]  On August 15, 2023, SC and Clean Harbors entered into a Purchase and Sale Agreement ("PSA"), but only with respect to Unit 2 and Unit 3.  ECF 49-9 at 2; ECF 49-13, ¶ 11; ECF 61-1, ¶ 73.  SC retained ownership of Unit 4, where the 40 parking spaces leased by Samuel are located.  ECF 49-2 at 7; *see* ECF 49-9 at 2.  The PSA set a contract closing date of January 31, 2024.  ECF 49-9, § 8.1.

Pursuant to the PSA, SC agreed to provide Clean Harbors with a special warranty deed, "conveying fee simple title in the Real Property subject only to the Permitted Exceptions[.]"  *Id.* § 8.4(a).  Among SC's other "Closing Deliveries" was "[a]n Agreement of Assignment and Assumption of Lease, . . . pursuant to which Seller [SC] shall assign, and Buyer [Clean Harbors] shall assume, Seller's right, title, and interest in the Lease dated August 24, 2017 by and between Seller, as Landlord, and Samuel, Son & Co. (USA), Inc., as Tenant, as amended . . . ."  *Id.* § 8.4(f).

On September 11, 2023, about a month after the PSA Agreement was signed, Dowell contacted Foster, asking for "an update on the sale" of Units 2 and 3 to Clean Harbors.  ECF 49-8 at 11–12.  Dowell sought "to start some dialog on a lease extension with" Clean Harbors.  *Id.* at 11.  Foster responded, with a copy to Bryan Girts, the vice-president of real estate at Clean Harbors.  *Id.* at 11; ECF 61-22, ¶ 5.  Foster indicated that Girts was "handling the matter" and indicated that Girts would "reach out" to Dowell "to have a conversation[.]"  ECF 49-8 at 11.

---

[9] Samuel was a potential buyer of the Property.  ECF 61-1, ¶ 37; ECF 61-9 at 2 (Foster's notes from a meeting with Samuel in May 2022, describing "Samuel or Clean Harbor [sic] as a Purchasor [sic]").

Girts asserts in his Declaration (ECF 61-22), that he "was responsible for negotiating the purchase of Units 2 and 3 on behalf of Clean Harbors." *Id.* ¶ 15. Dowell and Girts met in September 2023. *See* ECF 49-8 at 8–10.

Several months later, on January 29, 2024, Dowell wrote to Girts and asked for "an update on the sale of the building." *Id.* at 8. Dowell also asked whether Samuel should pay its monthly rent to SC or Clean Harbors, and noted that, if the sale went through, it would need to do "some paperwork" and set Clean Harbors "up as a vendor." *Id.* Foster replied: "The sale ha[s] not gone to settlement yet[.]" *Id.* at 7. And, he directed Dowell to "send the February rent to Second Chance" and stated that Clean Harbors and SC would "adjust at settlement . . . ." *Id.* Further, Foster advised that letters would be "coming to all affected parties after settlement with notice that the Leases have been assigned to the Buyer and details for future payments . . . ." *Id.*

Dowell was then informed by a paralegal at Clean Harbors that "[c]losing is set for the 31st [of January] and February rent should be paid to the new landlord [Clean Harbors]." *Id.* at 7. On January 29, 2024, Girts followed up in an email to Dowell, copying Clean Harbors' Lease Administrator, who was to provide Dowell "with the information" he would "need" to set up Clean Harbors as the vendor and would "request the information" Clean Harbors would "need as well." *Id.* at 6. On the same date, Dowell sent an email to Girts, requesting to "set up a call next week with the powers to be" once the sale was final "to discuss . . . [p]ossible lease extension through 12/31/2024", and asking what Samuel would "need to do as far [sic] vacating the building[.]" *Id.* at 5–6. Dowell remarked that Samuel looked "forward to working with Clean Harbors for [sic] balance of 2024." *Id.* at 6.

On January 31, 2024, SC and Clean Harbors executed an "Agreement of Assignment and Assumption of Lease," effective that date. ECF 49-12 (the "Assignment" or "Lease Assignment");

14

*see* ECF 61-1, ¶ 73.  Under the terms of the Lease Assignment, SC is the "assignor," Clean Harbors is the "assignee,"  and Samuel is the "lessee."  ECF 49-12 at 2.  It provides, in part, that SC and Samuel "entered into a certain Lease Agreement dated August 24, 2017, as amended by Lease Amendment to Lease dated September 30, 2022[.]"  *Id.*  The Assignment also references the Property at 1700 Ridgley Street.  *Id.*  It states, in relevant part, that SC "assigns, sets over and transfers to" Clean Harbors "all of its right, title and interest in the Lease . . . and Assignee accepts the assignment and assumes and agrees to perform . . . all of the terms, covenants and conditions of the Lease of the 'Landlord' thereunder[.]"  *Id.*

SC and Clean Harbors executed the "First Amendment to Purchase and Sale Agreement", along with a special warranty deed, granting all of SC's rights in Units 2 and 3 to Clean Harbors, both effective as of January 31, 2024.  ECF 49-10 ("Special Warranty Deed"), at 2; ECF 49-11 ("PSA Amendment"), at 2; ECF 49-13, ¶ 12.  Schedule 10.1.5 of the PSA Amendment identified two property leases, including the Lease.  ECF 49-11 at 7; ECF 61-22, ¶ 17.

Following the Assignment, Girts and Dowell continued to correspond regarding an extension of the Lease.  *See* ECF 49-8 at 2–6.  Notably, no representatives from SC participated in this correspondence.  *See id.*; ECF 61-1, ¶ 76.  During the exchanges, tensions appeared to mount between Clean Harbors and Samuel regarding the Lease.  Girts wrote to Dowell, stating that he was "getting internal pressure to take occupancy of the your [sic] space as soon as possible." ECF 61-23 at 2; ECF 61-22, ¶ 24.  Dowell responded that Samuel had been "led to believe" that it was "getting a lease extension," only to have "the rug . . . pulled out from" under it.  ECF 49-8 at 5.  Dowell also indicated that Samuel "is/has been exploring all our options and rights."  *Id.*  In his Declaration, Girts claims that he "told [Dowell] that Clean Harbors would be open to a reasonably

short extension of the Lease" and noted that the parties had discussed "alternatives, for example, December 31, 2024." ECF 61-22, ¶ 28.

In the same email chain, Dowell asked Girts logistical questions regarding Samuel's vacating of the Leased Premises. These included: "What is expected as we move out?" and "What equipment/office furniture are you interested [sic]?" ECF 61-26 at 2; ECF 61-22, ¶ 27.

On March 7, 2024, Cecile Chung, General Counsel and Corporate Secretary for Samuel, wrote to Girts. ECF 50-4; *see* ECF 59-1, ¶ 8. Chung asserted that "the *original term* of the Lease was extended to September 30, 2024." ECF 50-4 at 1 (emphasis in original). Moreover, Chung stated that Samuel was exercising "its option to extend the term of the Lease for one (1) additional period of two (2) years commencing October 1, 2024 pursuant to Section 3.2 of the Lease." *Id.* According to Chung, pursuant to Section 3.2(b) of the Lease, the Landlord was required to provide an offer rate "for Base Rent for the two year renewal term." *Id.*

Girts claims that the letter took him "completely by surprise." ECF 61-22, ¶ 32. He maintains that this was the "[t]he first" time he "heard that Samuel was taking the position that it had an option for the period 2024–2026." *Id.* ¶ 31.

On March 15, 2024, counsel for Clean Harbors responded to Samuel. ECF 50-5. Through counsel, Clean Harbors stated that, pursuant to Section 3.2 of the Lease, Tenant had "only one renewal option," the "original term of the Lease expired [on] September 30, 2022," and Samuel "exercised its Renewal Option" on July 15, 2022. *Id.* at 1. Therefore, according to Clean Harbors, Samuel's notice to exercise the Option through 2026 was "ineffective and of no force or effect." *Id.* Further, Clean Harbors stated: "The Lease expires on September 30, 2024." *Id.* However, "in the spirit of compromise," Clean Harbors indicated that it would be "willing to extend the current

16

term of the Lease through December 31, 2024, at the current rent, *conditioned on* Tenant's execution of the enclosed Term Sheet." *Id.* (emphasis in original).

Clean Harbors appended a term sheet to its letter. ECF 50-5 at 3–4. It stated, in relevant part, *id.* at 4: "Landlord and Tenant each represent, warrant and acknowledge that there are no additional renewal options available and the Lease shall expire on December 31, 2024. Tenant acknowledges that Landlord is offering this extension in reliance upon Tenant making the above representation and warranties, which will be relied upon by Landlord and its successors, assigns and designees." There is no indication that Samuel signed this term sheet.

Approximately five months later, in August of 2024, Samuel brought the instant suit against Clean Harbors and SC in the Circuit Court for Baltimore City, Maryland, seeking among other forms of relief, a declaration that Samuel was entitled to an option to renew the Lease through September 30, 2026, as Chung's letter claimed. *See* ECF 1-2, ¶¶ 40–50.

### E. The Parking Spaces

As discussed, under the Lease, Samuel had the use of 40 parking spaces located in Unit 4 of the Property. ECF 16-1 at 2  Pursuant to the Lease Amendment, Samuel's Lease was set to expire on September 30, 2024. ECF 49-7 at 2. Prior to that date, SC set aside 50 parking spaces for Samuel and its customers for their use for Ravens home games. ECF 49-13, ¶ 15.

On August 21, 2024, Dowell wrote to Foster regarding "the upcoming football year." ECF 49-8 at 17. He stated: "It looks like we will be here through March (maybe longer my guess) so we will be utilizing our parking spots for the upcoming season." *Id*. Dowell also said that Samuel would  "have a port-a-Jon delivered" for Samuel's customers and employees "for game day." *Id.* Dowell asked Foster to let him know "if there is any issue or problems" and to make the SC "gate attendants aware[.]" *Id.*

Foster responded: "We plan on honoring your lease until the termination date that we agreed to which was October 1st of 2024[.]" *Id.* at 16. Foster added, *id.*: "[W]hat you negotiate with Clean Harbors as to your occupancy of the building and any utilization of the property they now own is of course between the two of you . . . . ." *Id.* Further, Foster stated: "After October 1st, we [*i.e.*, SC] don't currently plan to limit your use of the parking lot on days without stadium events during regular business hours but reserve the rights to do so . . . . ." *Id.* However, Foster also said: "After October 1st for football games there will no longer be 50 spaces set aside for Samuels [sic] or your customers but as a recognition of our relationship over the years we will set aside 5 spaces for you and your staff . . . ." *Id.* Foster concluded that "the demand from our customers for store related parking during game days is off the charts and our primary goal is not to discourage retail traffic that is vitally important to us . . . . every space matters and we don't have the option of not being mindful of that . . . " *Id.*

Dowell forwarded the communication from Foster to Jay Gerken, another Samuel employee. *Id.* at 15. Dowell wrote, *id.*:

> Looks like we will lose our parking for Raven's [sic] games after our lease expires and could possibly lose our parking that we had with our original lease terms for normal business hours. I am not sure how we would handle this if any legal action is taken. I will figure something out for the customers for the balance of the year but wanted to give you a heads up on what is going on.

As these emails indicate, beginning in October 2024, and in the months after SC assigned its rights under the Lease to Clean Harbors, SC set aside only five parking spaces for Samuel's use. ECF 49-13, ¶ 16. Although SC made additional parking available to Samuel, SC charged Samuel, amounting to approximately $400 to $500 per Ravens home game. ECF 49-14 at 3, 4; ECF 49-13, ¶ 16. According to Samuel, these charges were "over and above the lease payments" and "in contravention of the terms of the Lease as amended." ECF 49-14 at 4.

Additional facts are included, *infra.*

18

**II.    Legal Principals**

**A.  Standard of Review**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact that precludes the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party

must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004)); *see Celotex Corp.*, 477 U.S. at 322-24.    Moreover, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).  And, "the mere existence of a scintilla of evidence in support of [a party's] position will be insufficient . . . ." *Anderson*, 477 U.S. at 252. Rather, "there must be evidence on which the jury could reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ."  However, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

20

that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Knibbs v. Momphand*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). But, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Brown v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). On the other hand, if testimony is based on personal knowledge

21

or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017).  Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

Nevertheless, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).  Rather, "to avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) (citations omitted).

When, as here, the parties have filed cross motions for summary judgment, the court must "'consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'"  *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 291 (4th Cir. 2021).  Simply because opposing parties have each moved for summary judgment does not mean that summary judgment to one side or the other is necessarily appropriate. Indeed, "[b]oth motions must be denied if the court finds that there is a genuine dispute of material fact." 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2022).  And, as noted, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Defs. of Wildlife*, 762

22

F.3d at 392 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

### B. Contract Principles

When, as here, state law claims are litigated in federal court based on diversity jurisdiction, federal courts apply federal procedural law and the substantive law of the state in which the proceeding is brought. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Leichling v. Honeywell Intern., Inc.*, 842 F.3d 848, 851 (4th Cir. 2016); *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 74 (4th Cir. 2016); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *see also, e.g.*, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Prof'l Massage Training Cent., Inc. v. Accreditation Alliance of Career Schools and Colls.*, 781 F.3d 161, 180 (4th Cir. 2015); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652-53 (4th Cir. 2010); *Demetres v. E. W. Const. Inc.*, 776 F.3d 271, 273 (4th Cir. 2015). Maryland is, of course, the forum state.

Plaintiff's breach of lease claim is properly analyzed as a breach of contract claim. *See Edokobi v. Piper Indus. L.P.,* No. 401, Sept. Term,2024, 2025 WL 1442679, at *13 (Md. Ct. Spec. App. May 20, 2025) ("Any breach of the lease would give rise to a breach of contract claim[.]"), *cert. denied*, 491 Md. 651, 340 A.3d 697 (2025).[10] With respect to contract claims,

---

[10] Under Maryland law, there is a species of a "Breach of Lease" claim that is "is a term of art for a particular cause of action that is distinct from an action for breach of contract." *Ben-Davies v. Blibaum & Assocs., P.A.*, 457 Md. 228, 252, 177 A.3d 681, 695 (2018); *see* Md. Code (2023 Repl. Vol., 2025 Supp.), § 8-402.1 of the Real Property Article ("R.P."). Breach of Lease is a claim brought by the landlord "[w]here a tenant breaches a lease in a way other than by failing to pay rent, and '[w]here an unexpired lease for a stated term provides that the landlord may repossess the premises prior to the expiration of the stated term if the tenant breaches the lease[.]'" *Ben-Davies,* 457 Md. at 257, 177 A.3d at 698 (quoting R.P. § 8–402.1(a)(1)(i))). Because Samuel, a tenant, lodged a breach of lease claim against its current and former landlords, the claim is a conventional breach of contract claim.

Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state.  *See, e.g. Oliveira v. Sugarman*, 451 Md. 208, 233 n.17, 152 A.3d 728, 743 n.17 (2017); *Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014).  "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs."  *Konover Property Trust, Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

Plaintiff's breach of contract claim derives from the execution in Maryland of contractual documents regarding the lease of property located in Maryland.  There is no choice of law provision in the contractual documents at issue.  ECF 49-2 at 9–10; *see* ECF 16-1; ECF 49-6; ECF 49-7.  But, both sides agree that Maryland law applies here.  ECF 49-2 at 9–10; ECF 59 at 9 n.2.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2–3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421–22 (Hollander, J.), *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).

Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'"  *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)).

To "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010).

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cty. v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)).

"'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (Hollander, J.) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Mutual assent is an integral component of every contract. *See, e.g.*, *Joseph Saveri Law Firm, Inc. v. Michael E. Criden, P.A.*, 759 Fed. App'x 170, 173 (4th Cir. 2019) (per curiam) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts often begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183,

25

1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) (Hollander, J.) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'") (citations omitted). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders, Inc.*, 178 Md. App. at 377–78, 941 A.2d at 1209–10; *see Canaras v. Lift Truck Serv.*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

Notably, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005). In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals[11] said: "Maryland law requires that a plaintiff alleging a breach of contract 'must of

---

[11] In the Maryland general election in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. I shall refer to the courts by the names that were in effect when the cited decisions were issued.

necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" (Citation omitted) (emphasis in *Polek*); *see also Robinson v. GEO Licensing Co., L.L.C.*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

In Maryland, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). This includes the determination of whether a contract is ambiguous. *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

"[W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985); *see Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.,* 434 Md. 37, 51, 73 A.3d 224, 232 (2013); *Dennis v. Fire & Police Employees Ret. Sys.,* 390 Md. 639, 656, 890 A.2d 737 (2006); *PaineWebber Inc. v. East,* 363 Md. 408, 414, 768 A.2d 1029 (2001); *Auction & Estate Representative, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441, 444 (1999); *see also Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 529, 200 A.2d 166, 170 (1964) ("[T]he practical construction of an agreement as evidenced by the acts and conduct of the parties is only available in the event of an ambiguity").

"It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and

unambiguous, simply to avoid hardships.'" *Calomiris v. Woods,* 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (quoting *Canaras v. Lift Truck Servs.,* 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.,* 966 F.2d 1443, 1992 WL 145269, at *5 (4th Cir.1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck."). Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensel v. Winchester Constr. Co.,* 392 Md. 601, 624, 898 A.2d 472, 485 (2006).

A "contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy–Lene of Washington,* 376 Md. at 167, 829 A.2d at 547; *see Cochran,* 398 Md. at 17, 919 A.2d at 710; *Auction,* 354 Md. at 340, 731 A.2d at 444–45; *Calomiris,* 353 Md. at 436, 727 A.2d at 363. Notably, if "a court finds the contractual terms at issue to be ambiguous", the contract "will be 'most strongly construed against' its drafter[.]" *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 399, 220 A.3d 303, 314 (2019) (quoting *Prima Paint Corp. v. Ammerman*, 264 Md. 392, 395, 287 A.2d 27, 28 (1972)).

Also of import, if the contract is ambiguous, the court may "consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Cnty. Commissioners of Charles Cnty. v. St. Charles Associates Ltd. P'ship,* 366 Md. 426, 445, 784 A.2d 545, 556 (2001); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.,* 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010). However, in the context of summary judgment, if "extrinsic evidence . . . leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact.'" *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC,* 875 F.Supp.2d 511, 526 (D. Md.

2012) (quoting *Washington Metro. Area Transit. Auth. v. Potomac Inv. Props., Inc.,* 476 F.3d 231, 234 (4th Cir. 2007)).

In this case, the parties disagree, *inter alia*, about whether the Terms Sheet constitutes a contract. In general, "parties may 'enter into a binding informal or oral agreement to execute a written contract; and, if the parties contemplate that an agreement between them shall be reduced to writing before it shall become binding and complete, there is no contract until the writing is signed.'" *Cochran*, 398 Md. at 18, 919 A.2d at 711 (quoting *Eastover Stores, Inc. v. Minnix*, 219 Md. 658, 665, 150 A.2d 884, 888 (1959)). In other words, "[i]f the parties do not intend to be bound until a final agreement is executed, there is no contract." *Cochran*, 398 Md. at 14, 919 A.2d at 708. Moreover, a party who contemplates that his agreement will be reduced to writing is at liberty to withdraw from negotiations before the final writing is signed. *Id.* at 19, 919 A.2d at 711; *Eastover Stores, Inc.*, 219 Md. at 665, 150 A.2d at 888.

The parties also disagree about whether or when Samuel exercised its Renewal Option. "An option is a continuing offer to sell during the duration thereof which on being exercised by the optionee becomes a binding and enforceable contract. And when the optionee indicates an intention to exercise the option and tenders the amount of the purchase price, he has performed under the option and is entitled to specific performance." *Diggs v. Siomporas*, 248 Md. 677, 681, 237 A.2d 725, 727 (1968) (internal citation omitted); *see Selig v. State Highway Admin.*, 383 Md. 655, 658 n.2, 861 A.2d 710, 712 n.2 (2004) (same).

In other words, "[w]hen an option is duly exercised it is said that the option 'ripens into' a binding contract." *Simpers v. Clark*, 239 Md. 395, 401, 211 A.2d 753, 756 (1965). *See Dambmann v. Lorentz*, 70 Md. 380, 17 A. 389, 389 (1889) ("[W]hen one party has an option, and gives notice that he has exercised it, the effect of such notice is to impose on the other party a binding obligation

29

enforceable in a court of law."). To exercise an option, the exercise "must be unconditional and in accordance with the terms of the option." *Simpers*, 239 Md. at 401, 211 A.2d at 756.

### III.   Discussion

### A.

Samuel lodges four claims against SC: breach of lease (Count Two); tortious interference with contractual relations (Count Three); request for declaratory relief (Count Four); and request for injunctive relief. ECF 16, ¶¶ 56–86. The claims are founded on Samuel's contention that the "Lease as amended in the Lease Amendment . . . allowed for Samuel to exercise its right to a two year option to extend the Term . . . until September 30, 2026[.]" *See*, *e.g.,* ECF 3 at 9; ECF 16 at 11.

To review, under the Lease, Samuel had one option to renew the Lease for an additional two years. ECF 16-1 at 19. Samuel claims that it did not exercise the Option in 2022, pursuant to the Lease Amendment. ECF 50 at 7–8. Rather, at that time, Samuel argues that the original term of the Lease was modified. *Id.; id.* at 3. Therefore, according to Samuel, in 2024 it retained the right to extend the Lease until September 30, 2026. *Id.* at 1.

Samuel also asserts that, under the Lease, it has access to 40 parking spaces in Unit 4. ECF 16-1 at 2. Although SC sold Unit 2 and Unit 3 to Clean Harbors, effective January 31, 2024, and assigned the Lease to Clean Harbors (ECF 49-9; ECF 49-10; ECF 49-12), SC retained ownership of Unit 4. *See* ECF 49-9 at 2; ECF 49-2 at 6–7. Beginning in October 2024, SC charged Samuel for parking for Ravens home games. ECF 49-14 at 3. Samuel complains that SC breached the Lease when, as of October 2024, "it refused to acknowledge Samuel's continued right under the Lease, as amended, to the forty parking spaces in Unit 4." ECF 16, ¶ 60. Furthermore, Samuel claims that SC breached the Lease "when it subsequently charged Samuel employees for parking

in the spaces included in the Leased Premises." *Id.* ¶ 61.

If Samuel had a right to extend its Lease through September 30, 2026, it would have the right to use the parking spaces in Unit 4, pursuant to the terms of the Lease, and SC would have no right to charge Samuel for the use of the parking spaces. On the other hand, if Samuel's Lease expired on September 30, 2024, as SC contends, then Samuel had no right to use the 40 parking spaces for Ravens games, and SC would be entitled to charge Samuel for use of them.

Samuel's claim against SC for breach of Lease turns on whether Samuel exercised its Renewal Option in 2022, pursuant to the Terms Sheet and/or the Lease Amendment, or, instead, whether Samuel had an Option to extend the Lease from October 1, 2024 through September 30, 2026.

As discussed, on March 7, 2024, Samuel notified Clean Harbors that it sought to exercise its Option to extend the Lease for two years. ECF 50-4. In its view, the extension of the Lease in 2022 did not amount to an exercise of the Option. As to the Terms Sheet, Samuel contends: "It is standard practice for parties to negotiate terms in a term sheet and then memorialize those terms in a formal agreement that includes a merger/integration clause subsuming any prior/preliminary agreements." ECF 63 at 1–2. It maintains that the Lease Amendment confirms that "it is the final and binding agreement between the parties" *Id.* at 2. And, according to Samuel, the Lease Amendment extended the Lease's *original term* by two years, while "unambiguously preserv[ing] Samuel's two-year option to be exercised at the end of the extension term." *Id.*; *see also id.* at 8. This is a strained and tortured construction of what occurred.

The Lease provided Samuel with one Option to extend the term for two years. ECF 16-1 at 19. In 2022, after discussions with Samuel, SC prepared the Lease Renewal Terms. ECF 49-6. The Terms Sheet plainly states: "Tenant [Samuel] is exercising one (1) two (2) year option to

31

renew the Premises[.]"  *Id.* at 2. The other terms, reviewed earlier at length, are completely consistent.  And, on behalf of Samuel, Lennartz "Accepted" the Terms Sheet on July 15, 2022.  *Id.* But, Samuel contends that the Terms Sheet was merely "a preliminary document used to outline key terms" before SC and Samuel came to a final agreement and is superseded by the Lease Amendment.  ECF 63 at 4; *see id.* at 3.

As to whether the Terms Sheet is a contract, I am mindful that "parties can make the completion of their contract depend upon the execution of a written instrument.  The question whether the parties negotiating a contract intended to be bound by their oral agreement but contemplated a written instrument merely a[s] evidence of their agreement, or whether they did not intend to bind themselves until a contract was prepared and signed by them, must be decided from the facts and circumstances in each particular case." *Peoples Drug Stores v. Fenton Realty Corp.*, 191 Md. 489, 493, 62 A.2d 273, 275 (1948).

Here, the Lease Renewal Terms was not an oral agreement.  Rather, it is a writing that sets forth all key provisions pertaining to the Lease extension.  Moreover, as noted, on July 15, 2022, Lennartz wrote on it:  "Accepted."  ECF 49-6 at 3.

To determine whether there is "indicia of intent," the court must "look at the contract language objectively, asking 'what a reasonably prudent person in the same position would have understood as to the meaning of the agreement.'" *4900 Park Heights Ave. LLC v. Cromwell Retail 1, LLC*, 246 Md. App. 1, 29, 227 A.3d 757, 773 (2020).  The Maryland Court of Appeals has enumerated "several factors that may be helpful in determining whether the parties have manifested an intention to be bound." *Cochran*, 398 Md. at 15, 919 A.2d at 708.  These include the language of the preliminary agreement; the existence of open terms; whether partial performance has occurred; the context of the negotiations; the custom of such transactions, such

32

as whether a standard form contract is widely used in similar transactions; whether the agreement

has few or many details; whether the amount involved is large or small; and whether it is a common

or unusual contract. *Id.* at 15–16, 919 A.2d at 708–09. In my view, it is abundantly clear that the

parties intended to be bound by the Lease Renewal Terms.

The case of *Falls Garden Condo. Ass'n, Inc.*, 441 Md. 290, 107 A.3d 1183, is instructive

as to whether the Renewal Lease Terms constituted a binding contract or, instead, a preliminary

agreement. ECF 62-1 at 16–17. Coincidentally, the case involved "a contest over . . . parking

spaces[.]" *Id.* at 293, 107 A.3d at 1184. After litigation commenced, the parties entered into a

letter of intent to settle the dispute. *Id.* at 294, 107 A.3d at 1185. However, "[p]roblems arose"

and the parties never executed a final settlement agreement. *Id.* The defendant filed a motion

seeking to enforce the letter of intent as a settlement agreement. *Id.* The plaintiff claimed that the

letter of intent was "not enforceable[.]" *Id.* at 294–95, 107 A.3d at 1185.

The Maryland Court of Appeals described "four distinct categories" of cases where

"'letters of intent' have been in issue." *Id.* at 301, 107 A.3d at 1189. It stated, *id.* (quoting

*Cochran*, 398 Md. at 13, 919 A.2d at 707–08) (internal quotation marks omitted):

> "(1) At one extreme, the parties may say specifically that they intend not to be bound until the formal writing is executed, or one of the parties has announced to the other such an intention.
>
> (2) Next, there are cases in which they clearly point out one or more specific matters on which they must yet agree before negotiations are concluded.
>
> (3) There are many cases in which the parties express definite agreement on all necessary terms, and say nothing as to other relevant matters that are not essential, but that other people often include in similar contracts.
>
> (4) At the opposite extreme are cases like those of the third class, with the addition that the parties expressly state that they intend their present expressions to be a binding agreement or contract; such an express statement should be conclusive on the question of their intention."

The court explained that the "essential distinction" between category two and three lies in "whether the terms included in the document are definite or indefinite[.]" *Falls Garden Condo Ass'n*, 441 Md. at 304, 107 A.3d at 1191. Moreover, the "terms under scrutiny must be material terms[.]" *Id.* The court stated: "In essence, a letter of intent may be enforced if it is inclusive, on its face, of all definite material terms[.]" *Id.* at 305, 107 A.3d at 1191.

The letter of intent at issue did not contain language indicating whether the parties intended to be bound. Moreover, the letter of intent included a provision that stated that one party would prepare a lease and submit it to the other party for review. *Falls Garden Condo Ass'n*, 441 Md. at 308, 107 A.3d at 1193. The plaintiff argued that this provision indicated that "'the parties intended to finalize' their agreement through a future agreement," and therefore it was not a binding contract. *Id.* (quoting *Cochran*, 398 Md. at 18, 919 A.2d at 711).

The court had to determine whether the letter of intent fell into category two, "'cases in which [the parties] clearly point out one or more specific matters on which they must yet agree before negotiations are concluded', or three, 'cases in which the parties express definite agreement on all necessary terms, and say nothing as to other relevant matters that are not essential, but that other people often include in similar contracts.'" *Id.* (quoting *Cochran,* 398 Md. at 13, 919 A.2d at 707–08). It decided that the letter of intent was "inclusive and definite as to all material terms." *Id.* at 307, 107 A.3d at 1192. For example, it designated the length of the lease, the number of parking spaces, the location at issue, and the price. *Id.* Additionally, it specified which party would be "responsible for maintenance and real estate taxes" and insurance. *Id.* Because "[d]efinite material terms of a lease were already included between the parties in the Letter of Intent," the Court determined that "the execution of a subsequent agreement [was] unnecessary." *Id.* at 308, 107 A.3d at 1193.

Accordingly, the court concluded that the letter of intent fell into the third category of cases, "'in which the parties express definite agreement on all necessary terms, and say nothing as to other relevant matters that are not essential, but that other people often include in similar contracts.'" *Id.* (quoting 1 Joseph M. Perillo, Corbin on Contracts, § 2.9). The court ruled that the letter of intent was "enforceable on its face, without reliance on the Lease thereafter prepared by the" defendant. *Falls Garden Condo Ass'n*, 441 Md. at 308, 107 A.3d at 1193.

Here, the Terms Sheet is more than a mere letter of intent. The Lease Renewal Terms, a written document, clearly indicates that Samuel was exercising its Option to renew the Lease. As indicated, it states, ECF 49-6 at 2: "Tenant is exercising one (1) two (2) year option to renew the Premises at 100% of the current fair market rent and has provided six (6) months prior written notice to Landlord." In addition, it expressly identifies the "Renewal Term" of 24 months, "expiring September 30, 2024." *Id.* at 2. And, it outlines all necessary and material terms to extend the Lease, such as the parties; the location of the Property; the original rental rate; the increased renewal rate; the commencement date of the renewal; and an apportionment between tenant and landlord regarding which party would be responsible for operating expenses, tenant improvements, and utilities. *Id.* at 2–3.

Moreover, the Lease Renewal Terms reflects the parties' intent to be bound. The document states: "On behalf of SC Property, LLC, we are pleased to present these Renewal Terms." ECF 49-6 at 2. It was signed by Foster, the CEO of SC. And, it was "Accepted" by Lennartz, the vice president of Samuel, in writing. *Id.* at 3; *see In re Est. of Marlin Ray Lawson*, No. 22, Sept. Term, 2022, 2023 WL 33242, at *4 (Md. Ct. Spec. App. Jan. 4, 2023) ("[A] signature affixed to a document normally signifies an intent to be bound and an agreement.").

Nevertheless, Samuel points to the fourth recital in the Lease Amendment as proof that the Lease Amendment preserved its Renewal Option to extend the Lease yet another two years. ECF 50 at 9.  The fourth recital states, ECF 49-7 at 2:

> **WHEREAS**, Landlord and Tenant desire to memorialize the extension of the Term of the Lease, to provide for the determination of fair market rent for the option period, should Tenant elect to so exercise the option, and to further modify such other provisions of the Lease as set forth herein.

According to Samuel, "the language 'should Tenant elect to so exercise the option' unambiguously contemplates Samuel's possible future exercise of its option.'"  ECF 50 at 10.  Additionally, Samuel argues that the Lease Amendment provides "the rental amount for the Extension Term of $42,975.05 monthly" and "provides additional terms for calculating the rent for a future option term."  *Id.*  Samuel reasons that if it "were exercising its option through the Lease Amendment, one of these two provisions would be superfluous."  *Id.*  Samuel also posits that "the only meaning that would 'give effect to each part' of the Lease Amendment is one that preserves Samuel's two-year option to be exercised in the future."  ECF 50 at 10.

In addition, Samuel relies on the following text to suggest that the two year extension of the Lease was not the result of its exercise of the Renewal Option.  ECF 50 at 9.  The Lease Amendment states, in part, ECF 49-7 at 2:  "The Lease is hereby amended such that *the original term of the Lease is extended for a period of two (2) years,* commencing on October 1, 2022, and expiring . . . on September 30, 2024 (such period, the 'Extension Term').  From and after the Effective Date of this First Amendment, all references in the Lease to the original term of the Lease shall be deemed and construed to include the Extension Term . . . ."  (Emphasis added).

In effect, Samuel contends that in 2022 the parties modified the Lease, but that Samuel did not exercise its Option at that time.  "To modify a contract, both parties must assent to the particular change."  *Geppi v. Pineau*, No. 1468, Sept.term,2020, 2021 WL 3046846, at \*5 (Md. Ct. Spec.

36

App. July 20, 2021). "Mutual assent comprises two elements: "(1) intent to be bound, and (2) definiteness of terms." *Expo Props., LLC v. Experient, Inc,* GLR-14-688, 2016 WL 3997290, at *7 (quoting *Cochran*, 919 A.2d at 708 (Md. 2007)), *aff'd*, 956 F.3d 217 (4th Cir. 2020). "Assent to an offer to vary, modify or change a contract may be implied and found from circumstances and the conduct of the parties showing acquiescence or agreement." *Cole v. Wilbanks*, 226 Md. 34, 38, 171 A.2d 711, 713 (1961). Moreover, a "valid contract modification requires . . . consideration[.]" *Expo Props., LLC*, 2016 WL 3997290, at *7 (internal citation omitted). The court "look[s] to the totality of a party's actions when determining whether waiver, or modification of the contract, has occurred." *Hovnanian Land Inv. Group, LLC v. Annapolis Towne Centre at Parole, LLC*, 421 Md. 94, 122, 25 A.3d 967, 983 (2011).

The Lease Amendment (ECF 49-7), drafted by Samuel, expressly provides that "Landlord and Tenant desire to memorialize the extension of the Term of the Lease . . . ." *Id.* at 2. It also states, *id.* at 2, § 2: "The Lease is hereby amended such that the original term of the Lease is extended for a period of two (2) years, commencing on October 1, 2022, and expiring at 11:59 p.m. on September 30, 2024 (such period, the 'Extension term')." Samuel's contention that the Lease Amendment extended "the original term" of the Lease by two years, but did not constitute the exercise of the Option, is specious.

There is no language in the Lease Amendment that states that the parties sought to modify the Lease or the Lease Renewal Terms. Nor is there any indication that the parties bargained to preserve Samuel's right to exercise its two-year renewal Option at a later time.

Samuel also claims that, even if the Lease Renewal Terms is a contract, the Lease Amendment supersedes it, and is the operative agreement, because it contains an integration

clause, unlike the Lease Renewal Terms.  ECF 63 at 3.  Section 11 of the Lease Amendment, titled

"Entire Agreement," is pertinent.  It provides, ECF 49-7 at 4:

> The Lease, as amended by this Lease Amendment, constitutes the final, complete, and exclusive statement of the agreement between the parties pertaining to their subject matter and supersedes any and all prior and contemporaneous understandings or agreements of the parties.

 "Maryland law generally recognizes the validity and effect of integration clauses."

*Hovnanian*, 421 Md. 94, 25 A.3d at 985-86.  But, "[u]nder Maryland law, the presence of an

express integration clause does not automatically resolve the parties' actual intention regarding

integration. *Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 477 F. App'x 84,

88 (4th Cir. 2012).  "Whether an agreement is integrated and the effect of an integration clause are

preliminary questions of interpretation determined by the court."  *Jaguar Land Rover N. Am., LLC*

*v. Manhattan Imported Cars, Inc.,* 738 F. Supp. 2d 640, 648 (D. Md. 2010), *aff'd,* 477 F. App'x 84

(4th Cir. 2012).  And, "[c]ourts in Maryland have explained that even the use of an unambiguous

phrase, such as 'this contract contains the final and entire [a]greement between the parties,' is not

invariably conclusive, and application of this type of phrase is a matter that may be subject to

further interpretation."  *Jaguar Land Rover N. Am., LLC*, 477 F. App'x at 88.

In other words, "although the inclusion of an integration clause 'suggests that the

agreement is fully integrated, it does not by itself dictate that conclusion.' And, it is also generally

true that 'a writing cannot of itself prove its own completeness, and wide latitude must be allowed

for inquiry into circumstances bearing on the intention of the parties.'" *Bakery & Confectionery*

*Union & Indus. Int'l Pension, Fund v. Ralph's Grocery Co.,* 118 F.3d 1018, 1024–25 (4th Cir.1997)

(internal citations omitted).

But, "[i]ntegration clauses are more likely to be enforced literally when the same parties

have entered into more than one agreement addressing the same subject."  *Jaguar Land Rover N.*

38

*Am.*, 477 F. App'x at 88. "In such a circumstance, the later-executed agreement annuls any prior agreements addressing the same subject because the agreements conflict and cannot be construed together. However, when separately-executed contracts between the same parties do not have conflicting provisions and are entered into as part of a single transaction, those agreements will be construed together even when they are executed at different times and do not refer to each other." *Id.* (internal citation omitted).

The provisions of the Lease Amendment and Lease Renewal Terms conflict only if the Court adopts Samuel's strained interpretation of the language in the Lease Amendment. In the third Whereas clause, the Lease Amendment expressly references the Option provision in the Lease, Section 3.2, and, in the language of the Lease Amendment, it "provides the Tenant" with "the right to extend the term of the Lease for one additional period of two (2) years." ECF 49-7 at 2. But, the Lease Amendment does not state that, with the extension of the Lease, Samuel retains its two-year Option.

Critically, even if the Lease Amendment is the operative instrument, Samuel fares no better. At best for Samuel, the Lease Amendment is ambiguous. As indicated, "[i]f the contract is ambiguous," the court may, at an appropriate time, "consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *St. Charles Associates Ltd. P'ship,* 366 Md. at 445, 784 A.2d at 556; *accord John L. Mattingly Const.,* 415 Md. at 327, 999 A.2d at 1074. The substantial extrinsic evidence, reviewed at length earlier, completely eviscerates Samuel's position. *See Hashmi v. Bennett*, 188 Md. App. 434, 453, 982 A.2d 818, 829 (2009), *aff'd,* 416 Md. 707, 7 A.3d 1059 (2010). And, as stated, "if there is an ambiguity", the contract must be construed against Samuel as the drafter. *See Cadem v. Nanna,* 243 Md. 536, 544, 221 A.2d 703, 708 (1966).

The Lease Amendment was effective as of September 30, 2022, when the Lease otherwise would have terminated.  ECF 49-7 at 2.  The correspondence between Samuel and SC reflects that both parties understood that Samuel sought to exercise its Option in the Lease, which would provide Samuel with a two-year extension of the Lease.    For example, on January 17, 2022, Dowell, the General Manager at Samuel, wrote to Foster that, "[a]fter talking to" Samuel's "lease corporate guy," Samuel would "have until 3/31 to take the 2 year option[.]"  ECF 49-5 at 52.  On March 16, 2022, Lennartz, an officer at Samuel, wrote to Foster, asking if SC would accept "the letter about exercising our renewal option by email" or by hard copy.  *Id.* at 49.  Significantly, Lennartz wrote to Foster on March 17, 2022, expressly asking SC to "accept this letter as confirmation of Samuel, Son & Co. (USA) Inc.'s intent to exercise the option to renew pursuant to Section 3.2" of the Lease.  ECF 49-4 at 2.

To be sure, Samuel also pursued a longer extension.  *See* ECF 49-4 at 2 (email from Lennartz to SC on March 17, 2022, stating: "While the existing renewal option is for two (2) years, per our conversation of March 9th, 2022, we are interested in a five (5) year term[.]"); ECF 49-5 at 52 (email from Dowell to SC on January 17, 2022, stating that Samuel "would like to do another 5 year with an option or extend the current option if possible."); *id.* at 32 (email from Shelhoss, COO of SC, to Lennartz and Dowell on May 25, 2022, stating that SC "fully intend[s] to honor [Samuel's] ability to renew for 2 years . . . and will discuss a longer term relationship as well").  But, that does not alter what occurred.

Representatives for SC and Samuel met on May 26, 2022, to discuss SC's renewal rate proposal.  *See* ECF 49-5 at 46–48; *id.* at 31–32.  Foster claims that during the meeting he told Dowell and Lennartz, the representatives of Samuel, "that SC Property would not agree to any extension of the Lease beyond the two years provided for in § 3.2, which would extend the Lease

term until September 30, 2024," because "SC Property believed that such an extension would make it more difficult [for SC] to sell the Property." ECF 61-1, ¶¶ 38–39. And, Dowell and Lennartz told him that "they understood SC Property's position on this issue and asked if SC Property would consider revisiting whether to extend the Lease beyond September 30, 2024 depending on the outcome of SC Property's efforts to sell." *Id.* ¶ 41.

Foster's contemporaneous notes from this meeting also indicate that this was what he communicated to Samuel. *See* ECF 61-9 at 2 (Foster's notes from Lease discussion with Samuel representatives on May 26, 2022, noting that the "new rate will be $7.9 NNN" for a "2 Year term" and that the "Next Term offered will be after decision on sale -+/- 4 months"). Moreover, he provided those confirmatory notes to Samuel after the meeting. *Id.*; ECF 61-11 at 2. There is no evidence that Samuel ever disputed the accuracy of the notes.

On July 4, 2022, Foster, the CEO of SC, provided Samuel with the Lease Renewal Terms, for a term "starting October 1, 2022." ECF 49-5 at 28; *see* ECF 61-1, ¶ 43. It expressly states: "Tenant is exercising one (1) two (2) year option to renew the Premises . . . ." ECF 49-6 at 2. According to Foster, despite the written Lease Renewal Terms, "Samuel insisted that SC Property draft a more formal document embodying the parties' agreement contained in the Lease Renewal Terms Sheet." ECF 61-1, ¶ 47. Beginning in August 2022, Samuel began to inquire with Foster regarding "the status of the lease amending document" and offered to draft it for SC, an offer that SC accepted. ECF 49-5 at 26–27. Foster received the Lease Amendment from Samuel on September 12, 2022, and executed the document, effective as of September 30, 2022. ECF 61-1, ¶¶ 49, 50.

After the Lease Amendment was executed, Samuel asked for another Lease extension, but was otherwise planning to vacate the premises when its Lease expired in 2024. *See* ECF 49-8 at

3 (Dowell writing to Girts on February 19, 2024, asking logistical questions regarding Samuel leaving the premises); *id.* at 5 (Dowell writing to Girts on January 31, 2024, that Samuel would be "moving a large business with equipment that takes time" and noting that he had "emails to confirm" that Samuel had been "led to believe we were getting a lease extension"); *id.* at 6–5 (Dowell writing to Girts on January 29, 2024, asking to discuss a "possible lease extension through 12/31/2024" and asking what Samuel would "need to do as far vacating [sic] the building"); *id.* at 13 (Dowell writing to Foster on July 27, 2023, asking if Foster "had some time . . . to meet to talk about the offer to extend our lease past Sept 2024.").

The Lease Amendment was intended to embody the Lease Renewal Terms. To the extent that Samuel claims that the text of the Lease Amendment reflects that Samuel did not exercise its Option at that time, but instead altered the expiration of the original Lease term, such a construction flies in the face of the parties' intentions. The extrinsic evidence clearly shows that Samuel and SC understood in 2022 that the extension of the Lease term was the result of the exercise of the Option by Samuel. *See* ECF 49-5 at 2–6.

Samuel's arguments to the contrary appear to be the product of imaginative and creative draftsmanship of the Lease Amendment, so as to bring about a result that, although desired by Samuel, was never contemplated by either SC or Samuel when the Lease Amendment was executed. The Lease Amendment did not rewrite the Lease to provide Samuel with a later Renewal Option. If the text of the Lease Amendment were construed to say what Samuel now contends, then Samuel engaged in chicanery in preparing the Lease Amendment.

Under the terms of the Lease, as amended by the Lease Amendment, Samuel's Lease expired on September 30, 2024. ECF 50-3 at 1. Accordingly, in October 2024, when SC charged

42

Samuel for using parking spaces in Unit 4, there was no Lease between Samuel and Clean Harbors. Accordingly, SC is entitled to summary judgment as to the Breach of Lease claim (Count Two).

It follows that Samuel's claim of tortious interference with contractual relations (Count Three), is also without merit. The existence of a contract between the plaintiff and a third party is an essential element of tortious interference with contractual relations. *Fowler v. Printers II, Inc.,* 89 Md. App. 448, 466, 598 A.2d 794, 802 (1991), *cert. denied,* 325 Md. 619, 602 A.2d 710 (1992). Because there was no contract between Samuel and Clean Harbors when SC charged Samuel for its use of parking spaces, Samuel's tort claim fails.

Moreover, because there is no merit to Samuel's substantive claims, Samuel's request in the Cross Motion for declaratory relief also fails. *See Ayres v. PHH Mortg. Corp.,* GJH-20-275, 2020 WL 3498158, at *10 (D. Md. June 29, 2020) ("[B]ecause each of Plaintiffs' substantive claims for relief have been dismissed, there is no basis upon which declaratory or injunctive relief could be granted."), *aff'd as modified*, 848 F. App'x 590 (4th Cir. 2021).

**B.**

SC claims that it is "entitled to an award of its attorneys' fees incurred in defending against Samuel's claims[.]" ECF 49-2 at 16. It relies on the provisions of the Lease.

In general, Maryland follows the "American Rule," under which "a prevailing party is not awarded attorney's fees 'unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution.'" *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 445, 952 A.2d 275, 281 (2008) (quoting *Thomas v. Gladstone*, 386 Md. 693, 699, 874 A.2d 434, 437 (2005)). "Contract provisions providing for awards of attorney's fees to the prevailing party in

litigation under the contract generally are valid and enforceable in Maryland." *Myers v. Kayhoe*, 391 Md. 188, 207, 892 A.2d 520, 532 (2006); *see Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 313 (4th Cir. 2020) (same).

SC's claim derives from an indemnity provision in the Lease.  ECF 49-2 at 16.  In particular, SC relies in part on Section 14.1 of the Lease.  Titled "Indemnity by Tenant", it states, ECF 16-1 at 35 ("Indemnity  Provision") (emphasis added):

> To the maximum extent permitted by law, but subject to the provisions of Section 14.5, *Tenant indemnifies Landlord,* any Superior Lessor and any Superior Mortgagee, and agrees to save them harmless and, at the option of any of them, defend them from and against any and all claims, actions, damages, liabilities and expenses *(including attorneys' and other professional fees)* judgments, settlement payments, and fines paid, *incurred or suffered by any of them in connection with loss of life or personal injury, or damage to property or to the environment, suffered by third parties, or in connection with any accident, injury or damages whatever in the Premises, and arising from or out of the conduct or management of the Premises or of any business therein, or any work or thing whatsoever done, or any condition created in or about the Premises during the Term of this Lease* or during the period of time, if any, prior to the Commencement Date that Tenant may have been given access to the Premises.

Section 14.5, which is referenced in § 14.1, is titled "Waiver of Rights of Recovery."  It concerns liability for "any loss or damage to any building, structure or other tangible property, when such loss is caused by any of the perils which are or could be insured against under a standard policy of full replacement cost insurance for fire, theft and all risk coverage, or losses under workers' compensation laws and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees[.]"  ECF 16-1 at 36.

The dispute at issue here has nothing to do with damage or loss to property.  Therefore, § 14.5 is irrelevant.

Another provision of the Lease is also pertinent.  Section 14.3 is titled "Survival of Indemnities." ECF 16-1 at 36 ("Survival Clause").  It states: "Landlord's and Tenant's obligations

44

pursuant to Section 14.1 and Section 14.2 shall survive any termination of this Lease with respect to any act, omission or occurrence which took place prior to such termination." *Id.*

"The scope of indemnification is a matter of contract interpretation . . . ." *Nova Research, Inc.,* 405 Md. at 449, 952 A.2d at 284. For the reasons already stated, Maryland law applies here. *See Baltimore Gas & Elec. Co. v. Rand Constr. Corp.,* RDB-24-1467, 2024 WL 4732772, at *4 (D. Md. Nov. 8, 2024) ("A Federal court sitting in diversity applies the law of the state in which it sits such that this Court applies Maryland law to the interpretation of the contract at issue [.]").

"An express indemnity agreement, being a written contract, must be construed in accordance with the traditional rules of contract interpretation." *Ulico Cas. Co. v. Atl. Contracting & Material Co., Inc.,* 150 Md. App. 676, 692, 822 A.2d 1257, 1266 (2003), *aff'd,* 380 Md. 285, 844 A.2d 460 (2004); *accord Thomas v. Capital Medical Management Associates, LLC,* 189 Md. App. 439, 468, 985 A.2d 51, 68 (2009). As discussed, under Maryland law, "'[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton,* 434 Md. at 51, 73 A.3d at 232 (quoting *Tomran, Inc. v. Passano,* 391 Md. 1, 14, 891 A.2d 336, 344 (2006)); *see Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, Inc.,* 376 Md. 157, 166, 829 A.2d 540, 546 (2003).

To determine the parties' intentions, courts first look to the written language of the contract. *Id.* When a contract's language is clear and unambiguous, "its construction is for the court to determine." *Wells,* 363 Md. at 251, 768 A.2d at 630; *see DIRECTV, Inc.,* 376 Md. at 312, 829 A.2d at 632 ("[W]here the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court."). When the contract's language is ambiguous, the court may consult extrinsic evidence to interpret the contract. *Cnty. Commissioners of Charles Cnty.,* 366 Md. at 445, 784 A.2d at 556.

Regarding the interpretation of indemnification provisions, the Maryland Court of Appeals has observed: "'Most courts distinguish between the recovery of attorney's fees incurred in defending against the third-party claim and those expended in prosecuting a claim against the indemnitor. Unless the indemnity provision expressly permits the recovery of fees incurred in prosecuting claims against the indemnitor, such fees are not recoverable.'" *Nova Research,* 405 Md. at 453, 952 A.2d at 286 (quoting Philip L. Bruner & Patrick J. O'Connor, Jr., 3 Construction Law § 10:51 (2007). Moreover, "'contractual attorney's fees provisions must be strictly construed to avoid inferring duties that the parties did not intend to create[.]'" *Nova Research,* 405 Md. at 455, 952 A .2d at 287 (quoting Robert L. Rossi, Attorneys' Fees § 9:18 (3d ed. 2002, Cum.Supp. 2007)).

According to SC, "nothing" in the Indemnity Provision "limits indemnification to suits brought by third parties[.]" ECF 49-2 at 17. Instead, SC claims that "the text covers 'any' claims 'paid, incurred or suffered by' the Landlord." *Id.* SC contends that Samuel asserted claims against SC "that squarely fit within the scope of Section 14.1 because they allege damages arising from or out of SC's conduct or management of the Premises." *Id.* SC points to Samuel's claim that SC "improperly charged" Samuel "for use of Unit 4 parking spaces for Ravens home games." *Id.*

Samuel maintains that SC has not properly presented its claim for attorney's fees because it "has no counterclaims in this action, much less one for indemnity." ECF 59 at 17. Furthermore, Samuel claims that "the plain language of the Lease's indemnification clause . . . makes clear that the provision applies only to third-party claims involving personal injury, property damage, or environmental harm." *Id.* According to Samuel, the Indemnity Provision "***does not*** authorize fee-shifting in direct disputes between the landlord and tenant over the meaning and enforcement of the Lease." *Id.* (emphasis in original). Claiming that this provision is "unambiguous," Samuel

interprets it to be "a standard third-party liability provision that does not apply to first-party disputes between the contracting parties themselves." *Id.* at 18.

Furthermore, Samuel argues that SC's "attempt to stretch this provision to cover its own legal fees" is "contradicted" by SC. *Id.* Samuel notes that SC "claims that it relinquished all rights and obligations under the Lease of January 2024, yet now it seeks to invoke the Lease's indemnity clause to recover fees for conduct occurring months later." *Id.* According to Samuel, "[t]his contradiction underscores the opportunistic nature of SC Property's arguments: it seeks to benefit from the Lease while disclaiming any responsibility under it." *Id.*

In my view, the Indemnity Provision does not provide a basis for SC to recover attorney's fees. Notably, SC did not lodge a counterclaim against Samuel to recover legal fees.[12]   It is not appropriate to seek legal fees based on the terms of a contract by raising the matter for the first time in a summary judgment motion, particularly when recovery of legal fees is not the norm.

In 1993, the Supreme Court adopted Fed. R. Civ. P. 54(d) (2), to "establish[ ] a procedure for presenting claims for attorneys' fees." Fed. R. Civ. P. 54(d)(2) advisory committee note (1993); *see Carolina Power & Light Co. v. Dynegy Mktg. &* Trade, 415 F.3d 354, 358 (4th Cir. 2005) (discussing passage of Fed. R. Civ. P. 54(d)(2)), *abrogated on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emps.*, 571 U.S. 177 (2014).

Entitled *Attorney's Fees,* Rule 54(d)(2) provides: "(A) *Claim to be made by motion.* A claim for attorney's fees and related nontaxable expenses must be made by motion *unless the substantive law requires those fees to be proved at trial as an element of damages*." (Emphasis added). To illustrate, the 1993 Advisory Committee Note states that Rule 54(d) (2) "does not . . .

---

[12] As noted, Clean Harbors did file a counterclaim for breach of lease. ECF 5.

apply to fees recoverable as an element of damages, as when sought under the terms of a contract; such damages typically are to be claimed in a pleading and may involve issues to be resolved by a jury."

The Fourth Circuit has explained: "The rule . . . creates a division in the handling of attorneys [sic] fees claims between the claims that are not part of the underlying substantive claim, which must be made by motion, and claims that are an element of damages, which presumably must be made by complaint." *Carolina Power & Light,* 415 F.3d at 358.  For example, attorney's fees claimed under a contract must be pled as damages if a contractual breach is a "condition precedent" to recovery.  *See id.* 358–62. As case law makes clear, however, a defendant's claim for fees pursuant to a contractual prevailing party provision is not an element of damages, because the claim is based on the outcome of litigation, not the merits of the underlying substantive claim. *See id.* at 358–62; *Grove v. George,* 192 Md.App. 428, 437, 994 A.2d 1032, 1037 (2010).

Here, SC seeks to recover attorneys' pursuant to an indemnification provision of the Lease. It is a contract claim.  Such a claim should be asserted by way of a complaint or a counterclaim. That did not happen.

Moreover, as discussed, SC assigned all its rights and obligations under the Lease to Clean Harbors on January 31, 2024.  ECF 49-12 at 2.  The "occurrence" which is at the center of Samuel's claim against SC is SC's action in charging Samuel for use of the parking in Unit 4 for Ravens games, beginning in October 2024.  ECF 16-1 at 36; *see* ECF 49-14 at 4.  SC's conduct took place after the assignment of the Lease to Clean Harbors.  Any obligation that Samuel may have owed to its Landlord under the terms of the Lease would be due to Clean Harbors, not SC.  Furthermore, as discussed, when SC levied its parking charges, the Lease had expired.

By its own admission, SC was not acting as a landlord when it barred Samuel from use of those parking spaces; the contractual relationship between the parties had terminated by virtue of the Assignment of the Lease. The Survival Clause only extends the indemnity obligations "with respect to any act, omission or occurrence which took place prior to" termination of the Lease. ECF 16-1 at 36.

The Lease expired on September 30, 2024. And, with the Assignment of the Lease, the relationship between SC and Samuel as tenant and landlord was severed. The Lease was no longer in effect when SC levied parking charges on Samuel, the subject of Samuel's claims against SC.

SC cannot have it both ways. It cannot use the Assignment as a shield and then a sword. Conduct that occurred after the Assignment of the Lease, including Samuel's suit against SC, does not give rise to a claim of attorney's fees based on the text of an expired contract.

### IV.    Conclusion

There is no merit to Samuel's claim that it did not exercise its Renewal Option in 2022, and therefore it was entitled to do so in 2024. I shall grant summary judgment to SC as to Counts Two, Three, Four, and Five. However, I shall deny SC's request for attorney's fees. I shall also deny Samuel's Cross Motion.

An Order follows.


Date:   March 4, 2026                                    /s/
                                              Ellen L. Hollander
                                              United States District Judge


49